**YUASA–GENERAL BATTERY CORPORATION, General Battery Corporation, Plaintiffs,**

v.

**UNITED STATES, United States International Trade Commission, Defendants,**

and

**Taiwan Electric Appliance Manufacturers Association et al., Intervenor-Defendants.**

Court No. 85-04-00483.

United States Court of International Trade.

May 22, 1987.

Office of General Counsel, U.S. International Trade Commission, Washington, D.C. (Lyn M. Schlitt, Michael P. Mabile and Judith M. Czako), for defendants.

Ablondi & Foster, P.C., Washington, D.C. (Italo H. Ablondi, F. David Foster and Sturgis M. Sobin), for intervenor-defendants.

### Opinion & Order

AQUILINO, Judge:

The U.S. International Trade Commission ("ITC") has reached a preliminary determination that there is no reasonable indication that an industry in

> the United States is materially injured or threatened with material injury ... by reason of imports from Taiwan of 12-volt motorcycle batteries, provided for in item 683.05 of the T[SUS] ..., which are alleged to be sold in the United States at less than fair value (LTFV).[1]

The companies who petitioned the ITC for relief commenced this action for judicial review of the foregoing negative determination. Their motion for judgment on the agency record, however, relies heavily on an issue of law which has since been resolved by the Court of Appeals for the Federal Circuit in a manner adverse to plaintiffs' position.

### I

The standard of judicial review of a preliminary ITC determination is whether it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(A).

Plaintiffs' transcendent point is that the scope of the Commission's authority in making a preliminary determination under the Trade Agreements Act of 1979 is circumscribed by a showing of mere "possibility" of injury on their part and by a proscription of weighing of conflicting evidence on the ITC's part in accordance with *Republic Steel Corporation v. United States*, 8 CIT 29, 591 F.Supp. 640 (1984), and *Jeannette Sheet Glass Corporation v.*

Brownstein Zeidman and Schomer, Washington, D.C. (Steven P. Kersner and Donald S. Stein), for plaintiffs.

---

**1.** *12–Volt Motorcycle Batteries from Taiwan*, 50 Fed.Reg. 9,141 (March 6, 1985), USITC Pub. 1654 (Feb. 1985) [hereinafter cited as "Pub. 1654"].

*United States,* 9 CIT ——, 607 F.Supp. 123 (1985).

The plaintiffs contend that the ITC failed to follow these cases in reaching its determination. The record herein supports this contention, and the defendants admit as much. *See generally* Defendants' Memorandum, pp. 12–40. That is:

The Commission respectfully renews its contention that, in a preliminary antidumping or countervailing duty ... investigation, the Commission may—indeed, must—*evaluate* all of the evidence on the record, including evidence obtained from parties opposing the petition for relief, in order to determine whether there is reasonable indication of material injury, or threat thereof, by reason of allegedly unfair imports....

The Commission respectfully notes its disagreement with the Court's rulings in *Republic Steel Corp.* ... regarding the parameters of the "reasonable indication" standard applicable to Commission preliminary investigations ... that an affirmative preliminary determination merely "commences" an investigation.... Thus, under that ruling, the Commission's preliminary determination is "pre-investigatory" ... and the Commission may not conduct an "investigation" by obtaining and weighing conflicting evidence to reach its determination. *Id.* at 12–14 (emphasis in original, footnote omitted).

This position of the ITC has now been sustained on appeal. That is, *American Lamb Company v. United States,* 9 CIT ——, 611 F.Supp. 979 (1985), followed *Republic Steel* and *Jeannette* on the basis of *stare decisis.* The court, however, certified an interlocutory appeal from its remand order which resulted in a decision by the Federal Circuit that the "ITC's method of proceeding in applying the statutory reasonable indication standard does not contravene but accords with clearly discernible legislative intent and is sufficiently reasonable." *American Lamb Company v. United States,* 785 F.2d 994, 1004 (Fed.Cir. 1986). In other words, "Congress intended

application of a narrow judicial review standard" *id.,* and a "reviewing court must accord substantial weight to an agency's interpretation of a statute it administers", 785 F.2d at 1001, citing *Zenith Radio Corporation v. United States,* 437 U.S. 443, 450–51, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978), and *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). Thus, the holding of *Republic Steel* relied on below in *American Lamb* and in other actions was reversed.

■ This decision also resolves—negatively—plaintiffs' primary point. *See American Lamb Company v. United States,* 785 F.2d at 998, n. 4.

## II

As indicated above, the plaintiffs presented their motion for judgment prior to the decision of the Court of Appeals, which necessarily has an impact on their other points:

### A. *Definition of Like Product*

The plaintiffs challenge the ITC's analysis of the merchandise at issue. The Trade Agreements Act, 19 U.S.C. § 1677(4)(A), defines "industry" in general to mean "the domestic producers as a whole of a like product", which term is defined in subparagraph (10) of section 1677 as

a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation under this subtitle.

The plaintiffs characterize the proceeding below as having been "directed against Taiwanese motorcycle batteries being sold or offered for sale in the replacement motorcycle market"[2]. Their petition stated further:

... This replacement market is separate and distinct from the market for original equipment manufacturers ("OEM"). To date, the Taiwanese product has not been sold, or offered for sale, in the OEM market. Consequently, this petition is addressed to the problems of the U.S.

---

**2.** Plaintiffs' Brief, p. 22 (quoting from the petition, R. Doc. 1, p. 11, n. 3).

manufacturers selling in the replacement market. R.Doc.1, p. 11, n. 3.

Despite this attempted refinement, the ITC determined to define the merchandise under investigation in such a manner as to encompass the entire market for 12–volt motorcycle batteries in the United States, not just that for replacements. *See* Pub. 1654 at 3–4. Counsel for the defendants contend:

> Under section [1677] (10), the Commission's decision regarding like product is made on the basis of the characteristics and uses of the product under investigation, not on its marketing and distribution. There are no differences in characteristics and uses between 12–volt motorcycle batteries sold in the original equipment (OE) market, and those sold in the replacement market. 12–volt motorcycle batteries sold as original equipment are identical in characteristics to 12–volt motorcycle batteries with the same specifications sold as replacement parts. Whether sold as original equipment or as replacement equipment, they share the same basic use as a source of electrical power for motorcycles. Batteries for the OE market and batteries for the replacement market are manufactured in the same plants, using the same production processes, equipment, and employees. A different distribution system or a different end user using the product for the same purpose is not a sufficient basis upon which to decide that two like products exist.[3]

██ This position, which has support in the record, is in accordance with law within the meaning of 19 U.S.C. § 1516a(b)(1)(A),

and it was not arbitrary, capricious or an abuse of discretion for the ITC to have taken such an approach. In reaching this conclusion, the court does not intend to imply that the Commission did not have discretion to reach its determination via the route urged by the petitioners, rather that it was not required to do so by the Trade Agreements Act.

**B.  *Material-Injury Analysis***

Plaintiffs' motion challenges the ITC's failure to find reasonable indication of material injury within the meaning of that act[4] on three grounds, to wit, (1) it "erred in its analysis of import trends", (2) the Commission erred in concluding that the "difficulties" of the other American manufacturer, the Exide Corporation, were caused by factors other than Taiwanese imports and (3) its "analysis of price suppression/depression in the U.S. market and of lost sales distorted the findings" made by the staff. Plaintiffs' Brief, pp. 29–37.

Initially, it is useful to point out that the ITC had rendered a final determination, albeit negative, *sub nom. Motorcycle Batteries from Taiwan*, 47 Fed.Reg. 13,609, USITC Pub. 1228, in March 1982. Thus, the Commission was not writing on an original slate in this matter. In particular, that investigation had led to a listing of motorcycle-battery imports for the period 1978 to September 1981. *See* USITC Pub. 1228 at A–24, A–34.

Plaintiffs' first specification of error centers on the ITC's use of the word "comparable"[5] in assessing the levels of imports in 1979 and 1980 and in 1984. *See* Plain-

---

**3.** Defendants' Memorandum, pp. 43–44. The ITC investigation found that "[v]irtually all U.S. production of motorcycle batteries is accounted for by two domestic producers". Pub. 1654 at A–4.

**4.** The pertinent part of this statute, as codified in Title 19, states:

§ 1673b.  Preliminary determinations
(a) Determination by Commission or reasonable indication of injury
    ... [T]he Commission, within 45 days after the date on which a petition is filed under section 1673a(b) of this title ..., shall make a determination, based upon the best information available to it at the time of the determi-

nation, of whether there is a reasonable indication that—
    (1) an industry in the United States—
        (A) is materially injured, or
        (B) is threatened with material injury, or
    (2) the establishment of an industry in the United States is materially retarded,
by reason of imports of the merchandise which is the subject of the investigation by the administering authority. If that determination is negative, the investigation shall be terminated.

**5.** *See* Pub. 1654 at 10.

tiffs' Brief, pp. 29–30. While this point has some merit in view of the statistics compared, any implicit error is harmless. Moreover, the investigation found that the two domestic producers had themselves contributed to these figures by importing batteries from Taiwan. *See* Confidential Document ("ConfDoc") 12 at A–7; Pub. 1654 at 5, A–18.

Plaintiffs' other two specifications relate to causation. The defendants argue that, since the ITC found no reasonable indication of material injury, it was not obligated to consider the relationship between the condition of the domestic industry and the challenged imports, relying on *American Spring Wire Corporation v. United States*, 8 CIT 20, 23, 590 F.Supp. 1273, 1276 (1984), *aff'd sub nom. Armco Inc. v. United States*, 760 F.2d 249 (Fed.Cir.1985). *See Jeannette Sheet Glass Corporation v. United States*, 9 CIT at 164, 607 F.Supp. at 132 (ITC not required to reach issue of causation in absence of finding of injury or retardation during preliminary investigation of alleged dumping). Nevertheless, the Commission stated (over the noted reservations of two of its members[6]):

> Even if we had concluded that there was a reasonable indication of material injury to the domestic industry, we would not have concluded that there is a reasonable indication that any such injury is by reason of the allegedly LTFV imports. Pub. 1654 at 9 (footnote omitted).

As for Exide Corporation's "difficulties", according to the ITC they were "due to several unusual events during 1983 and 1984, as well as internal factors, rather than by reason of the allegedly LTFV imports". *Id.* at 10. The plaintiffs criticize this "blanket statement". Plaintiffs' Brief, p. 31. However perspicacious their view may be, the record contains evidence sufficient to place the Commission's conclusion beyond the realm of arbitrary and capricious decisionmaking. *See, e.g.,* ConfDoc 12 at A–15 to A–18. While competition from Taiwan may well have had a negative impact on the company, the referenced events also did occur and also apparently did have a similar influence.

There is a degree of validity as well in plaintiffs' claim that the ITC's analysis "distorted" its staff's findings with regard to depression of prices in the U.S. market[7], but not enough to result in a conclusion that the Commission's characterization of the evidence was arbitrary and capricious in the context of its failure to find indication of material injury. That is, the plaintiffs understandably quibble with its statement that "imports tended to undersell the domestic product during 1984"[8] and also with its assessment that a "substantial proportion"[9] of those imports was for their own accounts. The defendants correctly contend, however, that the ITC recognized that price was a factor in the three lost sales which were confirmed, but that in none of those cases was it the sole basis. *See* Pub. 1654 at 11, n. 43.

In the end, as pointed out above, plaintiffs' complaint regarding the lack of a finding of a reasonable indication of material injury is with the Commission's weighing of the evidence in disregard of *Republic Steel* and its progeny,[10] which, of course, have been overruled.

---

**6.** *See* Pub. 1654 at 9, n. 34. On the other hand, footnote 2 on page 3 states:

> Chairwoman Stern does not regard it as analytically useful to consider the question of material injury completely separately from the question of causation. In general, she believes it to be appropriate to examine causal issues even when an industry is apparently in good condition to determine whether its performance had been materially worsened by the subject imports.

**7.** *Compare* Plaintiffs' Brief at 32–37 *with* Pub. 1654 at 10–11 *and* ConfDoc 12 at A–29 to A–32.

**8.** Pub. 1654 at 10.

**9.** *Id.* at 10, n. 42. Indeed, footnote 8 on page 5 of this document points out:

> YGB is a joint venture between Yuasa America, Inc., a wholly-owned subsidiary of Yuasa Japan, and General Battery Corporation. Yuasa America owns 51 percent of YGB. Yuasa Japan owns 49 percent of Yuasa Taiwan.

**10.** *See* Plaintiffs' Brief, p. 37.

### C. *Threat-of-Injury Analysis*

More problematic is the ITC's conclusion that there was no reasonable indication that the U.S. industry was threatened with material injury by the imports in question within the meaning of the Trade Agreements Act, *supra* note 4. The reasoning *in haec verba* of the Commission is as follows:

Imports from Taiwan increased during the period of investigation. However, a significant percentage of imports from Taiwan is accounted for by the imports of the two domestic producers, which increased 81 percent between 1982 and 1984. Although importers' inventories increased annually from 1982 to 1984, inventories as a share of shipments of the responding firms declined each year during the period under investigation. Taiwanese production has increased only slightly during each year of the period under investigation. Exports to the United States have accounted for a relatively stable percentage of Taiwanese production during the period under investigation. An increasing percentage of Taiwanese production was sold in Taiwan during each year of the period under investigation. There is nothing on the record which would indicate that there is likely to be a marked increase in the share of Taiwanese exports directed at the U.S. market in the near future.

In light of the condition of the domestic industry, and the fact that the trend of the industry's performance is positive, we conclude that there is no reasonable indication that allegedly LTFV imports are a threat of material injury to the U.S. industry producing 12–volt motorcycle batteries. Pub. 1654 at 11–12 (footnotes omitted).

This reasoning is said to be based on section 612(a)(2)(B) of the Trade and Tariff Act of 1984, Pub.L. No. 98–573, 98 Stat. 2948, 3033–34, which added a subsection F to 19 U.S.C. § 1677(7), to wit:

Threat of material injury.—

(i) In general.—In determining whether an industry in the United States is threatened with material injury by reason of imports (or sales for importation) of the merchandise, the Commission shall consider, among other relevant economic factors [11]—

.    .    .    .    .

(II) any increase in production capacity or existing unused capacity in the exporting country likely to result in a significant increase in imports of the merchandise to the United States,

(III) any rapid increase in United States market penetration and the likelihood that the penetration will increase to an injurious level,

(IV) the probability that imports of the merchandise will enter the United States at prices that will have a depressing or suppressing effect on domestic prices of the merchandise,

(V) any substantial increase in inventories of the merchandise in the United States,

(VI) the presence of underutilized capacity for producing the merchandise in the exporting country,

(VII) any other demonstrable adverse trends that indicate the probability that the importation (or sale for importation) of the merchandise (whether or not it is actually being imported at the time) will be the cause of actual injury, and

(VIII) the potential for product-shifting if production facilities owned or controlled by the foreign manufacturers, which can be used to produce products subject to investigation(s) under section 1671 or 1673 of this title or to final orders under section 1671e or 1673e of this title, are also used to produce the merchandise under investigation.

(ii) Basis for determination.—Any determination by the Commission under this subtitle that an industry in the Unit-

---

**11.** The court has deleted paragraph I since the factor set forth therein is to be considered "if a subsidy is involved", which is not the case here.

ed States is threatened with material injury shall be made on the basis of evidence that the threat of material injury is real and that actual injury is imminent. Such a determination may not be made on the basis of mere conjecture or supposition.

Congress has provided this list of factors to aid the ITC in carrying out its heavy responsibilities under the Trade Agreements Act. According to the Conference Report, H.R.Rep. No. 1156, 98th Cong., 2d Sess. 174–75 (1984), U.S.Code Cong. & Admin.News 1984, p. 4910, these factors were added to the law upon a recognition that

the projection of future events is necessarily more difficult than the evaluation of current data. Accordingly, a determination of threat will require a careful assessment of identifiable current trends and competitive conditions in the marketplace. This will require the ITC to conduct a thorough, practical, and realistic evaluation of how it operates, the role of imports in the market, the rate of increase in unfairly traded imports, and their probable future impact on the industry.

If this is what the 1984 act requires, the record at hand reveals that the ITC did not meet its mandate. Of course, as parts IIA and IIB of this opinion show, the court is not at liberty to substitute its view of the facts for that of the Commission. *See, e.g., Matsushita Electric Industrial Co. v. United States,* 750 F.2d 927, 936 (Fed.Cir. 1984). Rather, the court's review is to "ascertain whether there was a rational basis in fact for the determination". *American Lamb Company v. United States,* 785 F.2d at 1004, quoting from S.Rep. No. 249, 96th Cong., 1st Sess. 252 (1979), U.S.Code Cong. & Admin.News 1979, pp. 381, 638. However, "the grant of discretionary authority to an agency implies that the exercise of discretion be predicated upon judgment anchored in the language and spirit of the relevant statutes and regulations." *Freeport Minerals Company v. United States,* 776 F.2d 1029, 1032 (Fed.Cir.1985).

■ The Commission's above-quoted explanation regarding lack of reasonable indication of threat of material injury, *supra* page 1219, fails to convince this court that it is anchored in the language and spirit of the law. For example, the ITC's reasoning states that "[i]mports from Taiwan increased during the period of investigation." This is an understatement; the record shows that those imports increased from an estimated 257,000 units in 1982 to 446,000 in 1983 to 620,000 units in 1984 for a 241 percent increase overall. *See* Pub. 1654 at A–18. The 81–percent increase in imports by the domestic producers cited by the Commission, though correct, thus pales in comparison. Moreover, citation of this fact is misleading in that their share of the total imports, as the numbers indicate, actually declined during the period.[12]

The ITC states that "importers' inventories increased annually from 1982 to 1984" and also that "inventories as a share of shipments by the responding firms declined each year". Although there is support for both points in the record [13], only the former is specifically to be considered under the Trade and Tariff Act [14], while the latter is not necessarily supportive of a negative determination. Subsection 1677(7)(F)(i) (III), for example, focuses on any rapid increase in U.S. market penetration, and the record, in fact, shows just such an increase. *See* ConfDoc 12 at A–27.

The Commission states, again as quoted above, that Taiwanese production had increased only slightly during each year of the period under investigation. This is true if "only slightly" is the equivalent of 24.8 percent overall. *See* Pub. 1654 at A–17. Indeed, in the footnote (48) to its state-

---

12. *See* ConfDoc 12 at A–25. While the court has overruled plaintiffs' challenge to the ITC's characterization of this share as representing a "substantial proportion" in the context of its material-injury analysis, *supra* page 1218, suffice it to state here that that proportion is but a smaller fraction of the whole.

13. *See, e.g.,* Pub. 1654 at A–17.

14. *Cf.* 19 U.S.C. § 1677(7)(F)(i)(V).

ment, the ITC refers to the "apparently large increase in capacity between 1983 and 1984", which the court points out was notably underutilized both years. *See id.,* Table 9. *Cf.* 19 U.S.C. § 1677(7)(F)(i)(II) and (VI).

Next the Commission states that exports to the United States "have accounted for a relatively stable percentage of Taiwanese production", but this proves accurate only when measured against the increase in that production. On the other hand, this point is not an economic factor prescribed by the statute, though seemingly relevant. In fact, those exports, for which the United States is by far the largest market, grew by more than 18 percent from 1982 to 1984. *See* Pub. 1654 at A–17, Table 9.

Finally, the ITC states that an "increasing percentage of Taiwanese production was sold in Taiwan during each year". Again, though accurate[15], the statement must be tempered by the "large increase in capacity", by the fact that exports exceeded domestic shipments in each of the years[16] and by the lack of any statutory focus on this factor.

Of those factors set forth in the statute and seemingly overlooked by the commissioners, prices were addressed by them in their material-injury analysis. The finding was that prices "generally declined during 1983 and 1984". Pub. 1654 at A–22. Indeed, the staff reported on margins of underselling by the imports as follows:

> ... Domestic producers' and importers [*sic*] prices were roughly comparable during 1983. The weighted-average importers' price was higher by ... percent for the 12N12A–4A1 model in one quarter and lower in three quarters. For the 12N14A–3A model, the importers' prices were higher than producers' weighted-average prices in three quarters of 1983

(by as much as ... percent). *Importers' prices declined more rapidly than domestic producers' prices in 1984, resulting in underselling in all four quarters of that year for both models.*[17]

This staff analysis, on its face and without other, contradictory evidence, makes a negative (or the nonexistent) finding by the Commission of probability that imports of the merchandise will enter the United States at prices that will have a depressing or suppressing effect on domestic prices within the meaning of factor IV hard to reconcile. *Cf.* ConfDoc 12 at A–33 (Lost sales) and at A–34 (Lost revenue).

It is, of course, also difficult to discern the precise cause(s) of the decline of a business enterprise, an area in which the court must and does defer to the expertise of the ITC. However, the Commission found that Exide was "experiencing difficulties"[18], albeit, from the ITC's vantage point, not necessarily due to the foreign competition. Nevertheless, with a domestic industry comprised of but two manufacturers, the troubles of one would appear to be the kind of demonstrable adversity that indicates the probability that the importation of the merchandise (whether or not it is actually being imported at the time) will be the cause of actual injury as contemplated by 19 U.S.C. § 1677(7)(F)(i)(VII).

In sum, to the extent the facts in the record are analyzed in accordance with the threat-of-material-injury guidance provided by Congress in the Trade and Tariff Act, they reasonably indicate that such a threat was real and that actual injury was imminent. Stated another way, while economics may well be "an inexact science in which emotions play a big role"[19] and Congress has recognized that "the projection of future events is necessarily more difficult than the evaluation of current data"[20], fail-

---

**15.** *See* Pub. 1654 at A–17, Table 9.

**16.** *See id.*

**17.** Pub. 1654 at A–22 (emphasis added). The court has reviewed and considered the confidential numbers set forth in ConfDoc 12 at A–29 and which necessarily are left out of this public quotation.

**18.** Pub. 1654 at 9. *See id.* at 3, 10.

**19.** P. Samuelson, Economics, An Introductory Analysis, p. 9 (3d ed. 1955).

**20.** H.R.Rep. No. 1156, 98th Cong., 2d Sess. 174 (1984), U.S.Code Cong. & Admin.News 1984, p. 4910.

ure to find the existence of a reasonable indication of a threat of material injury on the record herein leaves this court unable to conclude that the ITC's determination was not arbitrary and capricious and an abuse of its discretion within the meaning of 19 U.S.C. § 1516a(b)(1)(A).

Furthermore, the economic factors in section 1677(7)(F)(i) are set forth in the conjunctive, which requires consideration of all of them, at a minimum. To the extent the ITC failed to consider factor IV in the context of threat of injury or factors VII and VIII at all, that failure was not in accordance with law within the meaning of 19 U.S.C. § 1516a(b)(1)(A); the agency must conduct its investigations under the applicable statutory provisions. *See, e.g., Canadian Meat Council v. United States,* 11 CIT ——, 661 F.Supp. 622, (1987).

\* \* \*

Now, therefore, in view of the foregoing, it is hereby

ORDERED that plaintiffs' motion pursuant to CIT Rule 56.1 for judgment upon the agency record be, and it hereby is, denied in part and granted in part in accordance with the above opinion; and it is further

ORDERED that this matter be, and it hereby is, remanded to the U.S. International Trade Commission for reconsideration of the issue of whether there is reasonable indication that the 12–volt-motorcycle-battery industry in the United States is threatened with material injury by reason of imports from Taiwan; and it is further hereby

ORDERED that the defendants file any determination of the issue remanded within 45 days hereof, that the plaintiffs have 15 days thereafter in which to respond and that the defendants and the intervenor-defendants have ten days to reply thereto.