VITRO FLEX, S.A. and Cristales Inastillables de Mexico, S.A., Plaintiffs,

v.

UNITED STATES, Defendant,

PPG Industries, Inc., L–N Safety Glass, S.A. de C.V., Defendants–Intervenors.

COURT No. 85–02–00198.

United States Court of International Trade.

May 30, 1989.

Brownstein, Zeidman and Schomer (Irwin P. Altschuler, David R. Amerine, Donald S. Stein) Washington, D.C., for plaintiffs Vitro Flex, S.A. and Cristales Inastillables de Mexico, S.A.

Stuart E. Schiffer, Acting Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civil Div. (Platte B. Moring, III) for defendant U.S.

Stewart and Stewart (Terence P. Stewart, David Scott Nance), Washington, D.C., for defendant-intervenor PPG Industries, Inc.

Jones, Day, Reavis & Pogue (Herbert J. Hansell, Jerome J. Zaucha), Washington, D.C., for defendant-intervenor L–N Safety Glass, S.A. de C.V.

## OPINION AND ORDER

CARMAN, Judge:

This action contests the determination of the International Trade Administration, United States Department of Commerce (hereinafter ITA or Commerce) to initiate a countervailing duty investigation pursuant to sections 701 and 303 of the Tariff Act of 1930, as amended, 19 U.S.C. §§ 1671 and 1303 (1982 & Supp. V 1987) (hereinafter the Tariff Act). Plaintiffs have moved for judgment upon the agency record and claim that the contested determinations, which are outlined later in this opinion, are unsupported by substantial evidence on the record or otherwise not in accordance with law.

## PROCEDURAL HISTORY

This action was originally filed as one of three separate actions which were consolidated under Consolidated Court No. 85–02–00264. The first action, Court No. 84–09–01322 filed by PPG Industries, Inc. (hereinafter PPG), challenged the ITA's determination not to initiate an investigation of (1) certain programs of the Mexican Government's natural gas pricing system and (2) the program for rescheduling of foreign debt through the Trust Fund for Coverage of Exchange Risk (FICORCA).

The second action, Court No. 85–02–00198 filed by Vitro Flex, S.A. and Cristales Inastillables de Mexico, S.A. (hereinafter Vitro Flex and Crinamex), contested certain aspects of the ITA's final determination and countervailing duty order in *Fabricated Automotive Glass From Mexico*, 50 Fed.Reg. 1,906 (1985). PPG and L–N Safety Glass S.A. de C.V. (hereinafter L–N Safety Glass or L–N) were granted leave to intervene and Vitro Flex and Crinamex were granted leave to defend against PPG's cross-claims.

The third action, Court No. 85–02–00264 filed by PPG, sought review of certain aspects of the ITA's final determination in *Fabricated Automotive Glass From Mexico*, 50 Fed.Reg. 1,906. Vitro Flex and Crinamex were granted leave to intervene.

By memorandum opinion and judgment the Court severed original Court Nos. 85–02–00264 and 84–09–01322 from Consolidated Court No. 85–02–00264 and dismissed those two cases for mootness. *PPG Industries, Inc. v. United States*, 11 CIT ——, 660 F.Supp. 965 (1987). The remaining part of Consolidated Court No. 85–02–00264 was redesignated as Court No. 85–02–00198.

## FACTS

On July 31, 1984, PPG filed a petition for initiation of a countervailing duty investigation concerning fabricated automotive glass from Mexico. Fabricated automotive

glass is laminated glass, made of a clear or tinted piece of plastic sandwiched between two sheets of float glass, which is used for automobile windshields and sometimes for side and rear windows. It can also be toughened or tempered glass which is usually used for side and rear windows. Defendant's Memorandum In Opposition To Vitro Flex, S.A.'s and Cristales Inastillables De Mexico, S.A.'s Motion For Review Of The Record And Motion For Remand Of The Fomex Issue (hereinafter Defendant's Memo) at 2.

The ITA initiated its investigation on August 27, 1984. 49 Fed.Reg. 33,919 (1984). A questionnaire was sent to the Government of Mexico on September 6, 1984. On October 9, 1984, the Mexican Government submitted the response of L–N Safety Glass and stated that L–N received no government subsidies. The Mexican Government identified three known manufacturers and exporters of fabricated automotive glass: Vitro Flex, Crinamex and L–N Safety Glass. 50 Fed.Reg. at 1,907. On October 30, 1984, the ITA requested additional information from all of the Mexican producers. Responses were received from L–N on November 1, 1984 and from the Mexican Government on behalf of Vitro Flex and Crinamex on November 13, 1984. Record Documents (hereinafter R.) 64, 68; Confidential Document (hereinafter C.) 18.

The ITA's preliminary determination dated November 1, 1984, did not include L–N Safety Glass among the firms found to have received subsidies. *Fabricated Automotive Glass From Mexico (Preliminary)*, 49 Fed.Reg. 43,984 (1984). The ITA prelim-

inarily determined that Mexican manufacturers or exporters of fabricated automotive glass had received a net bounty or grant of 2.61 percent *ad valorem*. The United States Customs Service (hereinafter Customs) was directed to suspend liquidation of all entries and withdrawals from warehouse for consumption, and to require a bond or cash deposit equal to the net bounty or grant. *Id.*

Two programs were preliminarily determined to confer bounties or grants:

(1) Fund for the Promotion of Exports of Mexican Manufactured Products (hereinafter FOMEX); and

(2) Preferential Federal Tax Incentives (hereinafter CEPROFI).

*Id.*[1]

When making its preliminary determination as to whether PPG had standing to file the petition, the ITA excluded Ford and Libbey–Owens–Ford from consideration as part of the domestic industry under Section 771(4)(B) of the Tariff Act, as amended, (19 U.S.C. § 1677(4)(B) (1982), since they were major importers with substantial ownership interests in the exporting companies. *Id.* at 43,984.

On November 1, 1984, when L–N Safety Glass provided supplemental information previously requested, it certified that it had received no subsidies. On November 14, 1984, L–N requested exclusion from the countervailing duty investigation and any final determination or order resulting therefrom pursuant to 19 C.F.R. § 355.38 (1984). R. 88. This request was made fourteen days after the filing of the ITA's preliminary determination and seventy-nine

1. The following programs were preliminarily determined not to be used:
   (1) Article 94 Loans;
   (2) FOMEX Loans to U.S. Importers;
   (3) National Preinvestment Fund for Studies and Projects;
   (4) Trust for Industrial Parks, Cities, and Commercial Centers;
   (5) Fondo Nacional de Fomento Industrial;
   (6) Preferential Prices for Natural Gas, Oil and Electricity;
   (7) Fund For Industrial Development;
   (8) Import Duty Reductions and Exemptions;
   (9) Accelerated Depreciation Allowances;
   (10) Guarantee and Development Fund for Medium and Small Industries;
   (11) Government Financed Technology Development;
   (12) Preferential State Investment Incentives;
   (13) Mexican Institute of Foreign Trade; and
   (14) New Exchange Risks Trust Fund Program.
   49 Fed.Reg. at 43,985–86.
   The ITA preliminarily determined that more information was needed to determine whether the following programs conferred a bounty or grant:
   (1) Subsidized Glass Inputs;
   (2) Bancomext Loans; and
   (3) Loans from Nacional Financiera, S.A.
   *Id.* at 43,986.

days after publication of the ITA's notice of initiation of the investigation.

The ITA conducted verification of the information provided by the Mexican Government, confirming that the Mexican manufacturers of automotive glass received benefits from only FOMEX and CE-PROFI, and that the Mexican manufacturers of fabricated automotive glass received CEPROFI benefits only during 1983. 50 Fed.Reg. at 1,907–08; C. 8, 9, 27.

On December 5, 1984, the plaintiffs submitted a draft suspension agreement to the ITA. R. 101. A revised version of the agreement which included L–N Safety Glass as a party was submitted on December 10, and a meeting of ITA officials and the parties involved was arranged for the following day. R. 105.

At that meeting, the attorney representing L–N Safety Glass refused to enter into the suspension agreement. Without the participation of L–N Safety Glass, the ITA determined that Vitro Flex and Crinamex did not account for a sufficient quantity of the exports of the merchandise under investigation to warrant a suspension agreement. On December 18, 1984, the ITA conducted a public hearing to review the respective positions of all the parties to the investigation. 50 Fed.Reg. at 1,907.

On January 14, 1985, the ITA issued a final affirmative countervailing duty determination and countervailing duty order. 50 Fed.Reg. 1,906 (1985). The ITA determined that certain benefits which constituted bounties or grants were provided to manufacturers or exporters in Mexico of fabricated automotive glass, except for fabricated automotive glass manufactured and exported by L–N Safety Glass. Id. at 1,906. L–N automotive glass was therefore excluded from the final affirmative countervailing duty determination and countervailing duty order. The ITA determined that bounties or grants were conferred upon exporters of fabricated automotive glass under two programs, FOMEX financing and CEPROFI tax credits.[2] Ac-

cordingly, the ITA directed Customs to require a countervailing duty cash deposit on imports of all fabricated automotive glass from Mexico, except for imports manufactured or imported by L–N Safety Glass. Id. at 1,906, 1,911. The ITA's cash deposit rate was established at 4.68 percent, which was based upon the ITA's calculation of net benefits attributable to FOMEX financing and CEPROFI tax credits. Id.

The ITA determined that PPG had standing to bring the petition based on the support of six of the ten domestic producers who accounted for more than 60 percent of the total United States production of fabricated automotive glass. Id. at 1,910. In addition, Commerce found Ford's original equipment automotive glass to be a "like product" to that produced by PPG. Id.

## CONTENTIONS OF THE PARTIES

Plaintiffs Vitro Flex and Crinamex are seeking review of certain determinations made by the ITA in the notice of initiation, 49 Fed.Reg. 33,919 (1984) and the final affirmative countervailing duty determination and countervailing duty order, 50 Fed. Reg. 1,906 (1985).

*Plaintiffs' Contentions*

Plaintiffs Vitro Flex and Crinamex make the following contentions:

(1) Defendant–Intervenor PPG did not file its petition "on behalf of" the domestic industry producing the merchandise. This claim is based upon the following factors:

(a) A collective majority of the members of the domestic industry producing the merchandise in question advised the ITA that they were opposed to the countervailing duty investigation; and

(b) The ITA excluded from the domestic industry Ford and Libbey–Owens–Ford, domestic producers who accounted for a substantial share of United States production of like or directly competitive products because they also import merchandise within the scope of the countervailing duty petition.

**2.** The fourteen programs which were preliminarily found not to be used and the three programs for which additional information was needed were finally determined as either not being used or not conferring bounties or grants. 50 Fed.Reg. at 1,908–09.

(2) As an alternative, the ITA erred by including products which are not produced by PPG or other members of the domestic industry (automotive glass imported from Mexico by Ford) within the scope of the investigation and order.

(3) As an alternative, the ITA erred by refusing plaintiffs' proposed suspension agreement because L–N Safety Glass chose not to participate. Since the ITA later decided to exclude L–N from the countervailing duty order, plaintiffs contend that L–N was not a necessary party to the agreement.

(4) As an alternative, the ITA erred by excluding L–N Safety Glass from the scope of the determination and order when L–N did not file a timely request for exclusion and other foreign manufacturers were materially prejudiced by this exclusion.

(5) As an alternative, the ITA erred in calculating an estimated countervailing duty cash deposit rate which greatly exceeded the net benefit received by foreign manufacturers subject to the ITA's investigation. The errors were made in:

(a) calculating the net benefit attributable to FOMEX loans; and

(b) calculating the estimated countervailing duty benefit attributable to CE-PROFI tax credits.

*Defendant's Contentions*

Defendant United States makes the following contentions:

(1) A remand is necessary for the limited purpose of recalculating all FOMEX benefits using verified 1983 information; and

(2) The final determination should be sustained in all other respects.

*Defendant–Intervenor PPG's Contentions*

Defendant-intervenor PPG contends that the final determination should be sustained in all respects.

*Defendant–Intervenor L–N Safety Glass' Contentions*

Defendant-intervenor L–N Safety Glass contends that it qualifies for exclusion for the following reasons:

(1) It neither sought nor received any subsidies;

(2) It was not alleged by any party to have received any subsidies;

(3) It submitted timely responses and cooperated fully throughout the investigation; and

(4) The fact that L–N Safety Glass requested exclusion more than thirty days following the publication of the notice initiating the investigation does not constitute a basis for overturning the exclusions because:

(a) The ITA's regulation does not establish a mandatory time limit for application for exclusion;

(b) The ITA is not precluded by its regulation from excluding L–N, even though its request was filed more than thirty days after the initiation notice publication. This is a matter within the discretion of the ITA; and

(c) Even though L–N did not request exclusion within the usual time period, based on the facts and circumstances of this case, including the fact that neither the delay nor the exclusion prejudiced the right of any other party, the ITA was within in its discretion in allowing the exclusion.

L–N Safety–Glass would not object to a remand that would leave it excluded from the proceedings.

## STANDARD OF REVIEW

In reviewing a countervailing duty investigation, this Court must hold unlawful any determination unsupported by substantial evidence on the record or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1982). The ITA's interpretation of the laws it administers should be sustained if that interpretation is reasonable. *United States v. Zenith Radio Corp.*, 64 CCPA 130, C.A.D. 1195, 562 F.2d 1209 (1977), *aff'd*, 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978); *American Lamb Co. v. United States*, 4 Fed.Cir. (T) 47, 785 F.2d 994 (1986).

## STANDING

Pursuant to section 1671a of 19 U.S.C., there are two methods for initiating a countervailing duty investigation. The investigation may be commenced by either the ITA on its own initiative (19 U.S.C. § 1671a(a)) or by the filing of a petition (19 U.S.C. § 1671a(b)) as was done by PPG in the instant case. The ITA determined that PPG had satisfied the requirements as set out in 19 U.S.C. § 1671a(b)(1). The statute reads as follows:

**(b) Initiation by petition**

**(1) Petition requirements**

A countervailing duty proceeding shall be commenced whenever an interested party described in subparagraph (C), (D), or (E) of section 1677(9) of this title files a petition with the administering authority, on behalf of an industry, which alleges the elements necessary for the imposition of the duty imposed by section 1671(a) of this title, and which is accompanied by information reasonably available to the petitioner supporting those allegations. The petition may be amended at such time, and upon such conditions, as the administering authority and the Commission may permit.

19 U.S.C. § 1671a(b)(1) (1982).

"Industry" is defined as "the domestic producers as a whole of a like product, or those producers whose collective output of the like product constitutes a major proportion of the total domestic production of that product...." 19 U.S.C. § 1677(4)(A) (1982 & Supp. V 1987).

▪ Plaintiffs contend that defendant-intervenor PPG did not bring its petition on behalf of the domestic industry producing the merchandise and thus lacked standing.

In *Gilmore Steel Corp. v. United States,* 7 CIT 219, 585 F.Supp. 670 (1984), the Court described the two-step process that determined standing. First the petitioner must be an interested party and second the petitioner must show that a majority of the industry backs its petition. 7 CIT at 226, 585 F.Supp. at 676.

In *Oregon Steel Mills Inc. v. United States,* 862 F.2d 1541 (Fed.Cir.1988), the Court of Appeals for the Federal Circuit found that lack of industry support was a ground for Commerce to revoke an outstanding antidumping duty order during administrative review of that order. 862 F.2d at 1545.

The Court recently looked at the standing issue in *Citrosuco Paulista, S.A. v. United States,* 12 CIT ——, 704 F.Supp. 1075 (1988). The Court found that:

> *Gilmore* and *Oregon Steel Mills* stand for the proposition that Commerce has discretion to dismiss, but is not required to dismiss, petitions that are not shown to be actively supported by a majority of the domestic industry. Neither the statute nor Commerce's regulations require a petitioner to establish affirmatively that it has the support of a majority of a particular industry, and the Court declines to impose such a requirement.

12 CIT at ——, 704 F.Supp. at 1085.

The ITA has made its views on the standing issue clear.

> As we have frequently stated, *see e.g. Certain Stainless Steel Hollow Products from Sweden,* (52 FR 5794, February 26, 1987); *Certain Fresh Atlantic Groundfish from Canada,* (51 FR 10041, March 24, 1986), there is nothing in the statute, its legislative history, or our regulations which requires that petitioners establish affirmatively that they have the support of a majority of their industries. In many cases, such a requirement would be so onerous as to preclude access to import relief under the antidumping and countervailing duty laws.

*Frozen Concentrated Orange Juice From Brazil: Final Determination of Sales at Less Than Fair Value,* 52 Fed.Reg. 8,324, 8,325 (1987).

Commerce relies on a petitioner's representation that it has filed on behalf of the domestic industry until it is affirmatively shown that this is not the case. *Final Affirmative Countervailing Duty Determination; Certain Fresh Atlantic Groundfish From Canada,* 51 Fed.Reg. 10,041, 10,043 (1986).

This Court holds that the ITA's determination that petitioner PPG had standing in the instant case was reasonable, supported by substantial evidence on the record and otherwise in accordance with law.

## EXCLUSION OF RELATED PARTIES

█ The court in *Gilmore* noted that "[a]ny untoward harshness resulting from this statutory scheme [the standing requirement] is ameliorated to a limited extent by 19 U.S.C. § 1677(4)(B), which excludes from the industry headcount those producers who are related to importers or foreign manufacturers of the subject product, or who themselves import the allegedly dumped merchandise." 7 CIT at 226–27, 585 F.Supp. at 676–77 (footnote omitted). The exclusion provision reads as follows:

**(B) Related parties**

When some producers are related to the *exporters or importers,* or are themselves importers of the allegedly subsidized or dumped merchandise, the term "industry" may be applied in appropriate circumstances by excluding such producers from those included in that industry.

19 U.S.C. § 1677(4)(B) (1982).

This exclusion provision is at issue in the instant case. Plaintiffs claim in Comment 1 of the notice of final determination and order that the ITA should not have excluded Ford and Libbey–Owens–Ford from the domestic industry for two reasons. First, when considering these companies' total production of the merchandise in question, their share of imports is very small. Second, plaintiffs contend that these two companies account for a major proportion of the United States production of the subject merchandise. 50 Fed.Reg. at 1,910.

The ITA responded to plaintiffs that it had determined that six of the ten domestic producers supported the petition. In order to determine industry support in terms of total volume of production, the ITA exercised its discretion under 19 U.S.C. 1677(4)(B) (Section 771(4)(B) of the Act) by excluding from consideration of the industry two domestic producers that fell into two of the following categories: importers of the subject merchandise, companies related to importers of the subject merchandise or companies related to exporters of the subject merchandise. *Id.*

The two, Ford and Libbey–Owens–Ford are importers of fabricated automotive glass from Mexico and are each related to different exporters of the subject product. These companies oppose the petition. Circumstances are appropriate in this case for excluding them because they are the major importers of the subject merchandise and each has a substantial ownership interest in a Mexican exporter. As importers, they would be liable for countervailing duties and they would lose any competitive advantage they receive from importing allegedly subsidized merchandise. As parties related to exporters, they have an interest in preventing the issuance of a countervailing duty order on the subject merchandise.

*Id.*

The exclusion of related parties statute was also at issue in *Citrosuco* which was discussed *supra.* In *Citrosuco,* Commerce excluded parties that were *either* related to the exporters or firms whose imports of the subject merchandise exceeded 50 percent of their total productions. 12 CIT at ——, 704 F.Supp. at 1085.

Plaintiff Citrosuco argued that Commerce had acted *ultra vires* in using 19 U.S.C. § 1677(4)(B) to exclude producers who imported more than 50 percent of their total product from Brazil. *Id.* The Court found it reasonable to apply the statute to exclude those producers. *Id.* 704 F.Supp. at 1086.

In the instant case, plaintiffs argue that Mexican imports of the subject merchandise comprise only a *small* share of the total production of the merchandise produced by Ford and Libbey–Owens–Ford. However, unlike the producers in *Citrosuco,* these two producers are each related to different exporters of the subject merchandise. This Court holds it was reasonable for Commerce to apply 19 U.S.C. § 1677(4)(B) to exclude these two producers who are both importers and are both related to different exporters of the subject

product. This Court holds that the ITA's determination to exclude related parties was supported by substantial evidence on the record and otherwise in accordance with law.

## LIKE PRODUCT

■ Plaintiffs contend that the ITA erred by refusing to exclude from the scope of the investigation and countervailing duty order automotive glass imported from Mexico by Ford for use solely as original equipment in Ford vehicles. Ford purchased the automotive glass almost exclusively from its wholly-owned facilities or from affiliate companies in which Ford had at least a minimum of 40 percent ownership interest. Plaintiffs submit that because this automotive glass is sold almost exclusively in the market supplying original equipment automotive glass to Ford, it is not a product which is like PPG's automotive glass which is sold in the domestic market. Brief In Support Of Motion For Judgment Upon The Agency Record Of Plaintiffs Vitro Flex, S.A. And Cristales Inastillables De Mexico, S.A. (hereinafter Plaintiffs' Brief) at 47–48.

Like product is defined as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation under this subtitle." 19 U.S.C. § 1677(10) (1982).

In *YUASA–General Battery Corp. v. United States*, 11 CIT ——, 661 F.Supp. 1214 (1987), the Court reviewed the like product issue as applied to motorcycle batteries sold in the original equipment market and those sold in the replacement market. These batteries were identical in characteristics and shared the same basic use. The Court upheld the determination by the ITC defining the merchandise under investigation in such a manner as to encompass the entire domestic market for motorcycle batteries. 11 CIT at ——, 661 F.Supp. at 1217.

In the instant case, plaintiffs' argument centers on the market in which the merchandise is sold as opposed to whether the actual products being compared share characteristics and uses. Plaintiffs outline a

corporate policy adopted by Ford to ensure that it has a steady supply of the subject merchandise for use in its vehicles. Plaintiffs' Brief at 48–49. The fact that Ford has chosen to purchase automotive glass in this manner has no bearing on the characteristics and uses of the product in question.

This Court holds that the ITA's determination to include the automotive glass imported by Ford within the scope of the countervailing duty order and investigation was supported by substantial evidence on the record and otherwise in accordance with law.

## SUSPENSION AGREEMENT

■ Plaintiffs contend that the ITA erred by refusing to enter into a suspension agreement with them in December of 1984 because L–N Safety Glass chose not to participate. Since subsequently in January of 1985 the ITA chose to exclude defendant-intervenor L–N Safety glass from the proceedings, plaintiffs claim that L–N was not a necessary party to the agreement. As noted above in the recitation of facts, L–N Safety Glass refused to enter into a suspension agreement and the ITA determined that the plaintiffs alone did not account for a sufficient quantity of the exports of the subject merchandise to warrant the agreement.

The standard for determining whether or not to enter into a suspension of a countervailing duty investigation is found in Title 19 and the implementing regulations of the ITA. Section 1671c of Title 19 states in pertinent part:

**(b) Agreements to eliminate or offset completely a subsidy or to cease exports of subsidized merchandise**

The administering authority may suspend an investigation if the government of the country in which the subsidy practice is alleged to occur agrees, or exporters who account for substantially all of the imports of the merchandise which is the subject of the investigation agree—

(1) to eliminate the subsidy completely or to offset completely the amount of the net subsidy, with respect to that mer-

chandise exported directly or indirectly to the United States, within 6 months after the date on which the investigation is suspended, or

(2) to cease exports of that merchandise to the United States within 6 months after the date on which the investigation is suspended.

\*   \*   \*   \*   \*   \*

**(d) Additional rules and conditions**

**(1) Public interest; monitoring.**

The administering authority shall not accept an agreement under subsection (b) or (c) of this section unless—

(A) it is satisfied that suspension of the investigation is in the public interest, and

(B) effective monitoring of the agreement by the United States is practicable.

19 U.S.C. § 1671c (1982 & Supp. V 1987).

In addition, section (e) of 19 U.S.C. § 1671c describes the procedure for suspension of investigation and section (g) describes when the investigation is to be continued upon request.

The definition of the term "substantially all" [3] in 19 U.S.C. § 1671c(b) as well as other relevant procedures are found in 19 C.F.R. § 355.31:

(c) *Definition of "substantially all".* For purposes of section 704(b) and (c) of the Act, exporters who account for "substantially all" of the imports in question shall mean exporters who have accounted for no less than 85 percent by volume of the subject merchandise imported into the United States during the period of investigation, or such other recent, representative period determined appropriate. The number and identity of affected exporters shall be considered no less frequently than once annually in connection with the determination required under section 751 of the Act, and, if appropriate, additional or different exporters may be required to furnish assurances to en-

sure continued applicability of the assurance to the requisite percentage of the affected trade.

\*   \*   \*   \*   \*   \*

(h) *Procedures for suspension of investigation.* Prior to accepting any agreement under section 704:

(1) The petitioner shall be notified and consulted with concerning the Secretary's intention to suspend the investigation. A copy of the proposed agreement shall be furnished to the petitioner no less than 30 days prior to the proposed suspension of the investigation. Any such agreement shall contain the procedures to be followed to monitor compliance, and a statement of the compatibility of the agreement with the requirements of subsections (b) and (d) or (c) and (d) of section 704 of the Act;

(2) All parties to the proceeding shall be notified of the proposed suspension not less than 30 days prior thereto; and

(3) All parties to the proceeding and other government agencies which may have an interest in the effects of the agreement shall be afforded an opportunity to submit written comments and information for the record with respect to the proposed suspension.

19 C.F.R. § 355.31 (1984).

█ The above statutes and regulations, in addition to outlining which requirements must be met before a suspension agreement can be accepted by the ITA, indicate that the ITA is under no requirement to accept any suspension agreement. Plaintiffs do not contest the fact that they do not account for 85 percent or more of the export volume of the subject merchandise. Stipulation of Facts, ¶ 49. This is a requirement that must be met before the ITA can accept any suspension agreement. 19 U.S.C. § 1671c(b); 19 C.F.R. § 355.31(c).

---

**3.** The House of Representatives also commented on the definition of "substantially all." "[T]he Committee intends the phrase 'exporters accounting for substantially all the imports of the merchandise' to require exporters accounting

for at least 85% of the imports during the most recent representative period." H.R.Rep. 317, 96th Cong., 1st Sess. 54 (1979), U.S.Code Cong. & Admin.News 1979, pp. 381, 440.

Plaintiffs argue that L–N Safety Glass' participation in the suspension agreement was not necessary since exports by L–N were excluded from the countervailing duty order. The ITA made two independent determinations: (1) without L–N's participation, plaintiffs could not meet the required 85 percent of the export volume of the subject merchandise which would allow for a suspension agreement on December 11, 1984; and (2) L–N had received no benefits amounting to countervailable subsidies and was excluded from the countervailing duty order on January 7, 1985.

Plaintiffs argue that a company found not to be receiving countervailable subsidies should not have been a required participant in a suspension agreement proposed before it was determined that the company did not receive any subsidies. This argument falls of its own weight. At the time of the proposed suspension agreement, L–N Safety Glass was still a participant in the uncompleted countervailing duty investigation and at that point the ITA did not know that L–N had not received countervailable subsidies. Furthermore, the fact that L–N did not receive countervailable subsidies did not make it any less an exporter of the subject merchandise and did not make the plaintiffs into exporters of 85 percent or more of the subject merchandise. L–N Safety Glass chose not to participate in the suspension agreement and the ITA determined at that time not to accept the proposed suspension agreement without L–N. This Court holds the determination by the ITA was reasonable, supported by substantial evidence on the record and otherwise in accordance with law.

### EXCLUSION OF L–N FROM THE COUNTERVAILING DUTY ORDER

■ Plaintiffs claim in the alternative that the ITA erred by excluding L–N Safety glass from the scope of the determination and order when L–N did not file a timely request for exclusion. Plaintiffs also claim that they were materially injured by this exclusion.

It is agreed by all parties that L–N Safety Glass did not file a request for exclusion within 30 days after the publication of the notice of investigation. Plaintiffs claim that because L–N's request was not made within the 30 day time frame, that request should have been denied as untimely. L–N Safety Glass contends where there is a request for exclusion, there is a conclusive and irrebuttable presumption that such an application made within 30 days is timely. Where such an application is made after the 30 day period, asserts L–N Safety Glass, the ITA has discretion to exclude a firm that has been investigated and found not to have received countervailable subsidies.

Plaintiffs urge the fundamental principle of administrative law that an agency is bound by its own regulations as much as any other party is bound, citing *Arizona Grocery Co. v. Atchison, Topeka, and Santa Fe Railway Co.,* 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348 (1932). They argue that the ITA was bound to follow 19 C.F.R. § 355.38 which outlines the filing of a request for exclusion from a countervailing duty order. The section reads as follows:

> **§ 355.38  Effect on firms not benefitting from subsidy.**
>
> Any firm which does not benefit from a subsidy alleged or found to have been granted to other firms producing or exporting the merchandise subject to the investigation shall, on timely application therefor, be excluded from a Countervailing Duty Order. An application shall be considered timely if made within 30 days after publication of a "Notice of Initiation of Countervailing Duty Investigation." The name of any such firm which is determined to have satisfied the requirements for exclusion will be published in the FEDERAL REGISTER.

19 C.F.R. § 355.38 (1984).

L–N Safety Glass argues that the analysis by the ITA of the regulation in question should be controlling. The analysis by the ITA provides in part as follows:

> 25. *Section 355.38 Effect on Firms Not Benefiting From Subsidy.* Conflicting comments were received pertain-

ing to this section: some recommended that exclusion be automatic; others that it be discretionary. Practical administrative considerations dictate that a firm which although potentially subject to an order, has not itself been investigated, should bear the burden of making application for exclusion and supplying the necessary information. Those firms which are investigated will automatically be excluded if exclusion is appropriate. Where firms are excluded, however, the regulations provide for publication of the name of any firm so excluded.

*Ordinarily,* firms wishing to be considered for exclusion from any possible affirmative determination should submit an application for exclusion, together with all necessary supporting documentation, no later than 30 days after the date of publication of the notice of Initiation of Countervailing Duty Investigation.

*Final Rules and Request for Comments: 19 C.F.R. Part 355,* 45 Fed.Reg. 4,932, 4,936 (1980) (emphasis added).

L–N Safety Glass' situation in the instant case appears to be covered by the ITA's analysis as to how such situations should be handled. L–N was a firm that was investigated by the ITA and the agency determined that exclusion was appropriate. In the notice of the final affirmative countervailing duty determination and order, the ITA stated that, "[w]e determine that no benefits which constitute bounties or grants are being provided with respect to fabricated automotive glass manufactured and exported by L–N Safety Glass. L–N Safety Glass, therefore, is excluded." 50 Fed.Reg. at 1,906. In an internal ITA memorandum, the exclusion decision was further explained:

L–N Safety Glass submitted timely responses in this investigation, has participated and cooperated fully at all stages, and has been verified to have received no benefits. Further, the company has never been alleged to have received subsidies. We believe that allowing an exclusion in this instance promotes fair, unsubsidized international trade, which should be encouraged.

Memorandum of Ken Haldenstein, International Trade Administration, Jan. 7, 1985 (R. 129).

Plaintiffs argue that the exclusion was prejudicial to them and cite situations where prior exclusions were prejudicial in nature. In *Bricks From Mexico; Final Affirmative Countervailing Duty Determination and Countervailing Duty Order,* 49 Fed.Reg. 19,564 (1984), two firms that were selected as part of the verification sample were found not to have received benefits. These firms were denied exclusion after making a request more than 30 days after the date of publication of the notice of the initiation. The ITA denied exclusion because it would have been unfair to other companies who were not chosen for the verification sample but were otherwise similarly situated. 49 Fed. Reg. at 19,568. However, in the instant case only Vitro Flex, Crinamex and L–N Safety Glass produced the subject merchandise. Since every producer was thoroughly investigated, there was no risk of prejudice to any of the parties as was the case in *Bricks From Mexico.*

Plaintiffs' claims of prejudice by the exclusion of L–N Safety Glass are *not* persuasive. Plaintiffs' claim of prejudice because L–N refused to join in a proposed suspension agreement where L–N was ultimately excluded from the affirmative determination upon the finding of the ITA that L–N received no bounties or grants must be treated as frivolous.

Plaintiffs further contend that L–N Safety Glass has benefited from its failure to file its exclusion application within the 30 day period. The Court notes that by not filing within this designated period, L–N did not ensure that its application would be considered timely and indeed ran the risk of not being granted an exclusion by discretion of the ITA. In *West Coast Industries, Inc. v. United States,* 3 CIT 73, 75, 1982 WL 2213 (1982), the Court noted that an application for exclusion made after the 30 day period was "made *too late* to impose on Commerce any obligation to examine [plaintiff's] operations during the course of its *investigation* as contemplated by 19

C.F.R. § 355.38" (emphasis in original). The fact that L–N ran the risk of not being granted an exclusion that was ultimately granted in the agency's discretion might have harmed L–N, but not the plaintiffs.

L–N Safety Glass also makes a reasonable argument as to why it waited more than 30 days before filing for exclusion. Response of Defendant–Intervenor L–N Safety Glass, S.A. de C.V. In Opposition To Motion of Vitro Flex, S.A. And Cristales Inastillables De Mexico, S.A. For Judgment Upon The Agency Record at 13 n. 2. The ITA was still investigating subsidy programs after the expiration of the 30 day period. Additional information was requested from the Mexican Embassy on October 30, 1984, 64 days after the investigation was initiated. L–N Safety Glass responded on November 1, 1984 and certified that it had received no subsidies. On November 14, 1984, L–N Safety Glass applied for exclusion. L–N contends that an application for exclusion before November 14, 1984 would have been insufficient to support exclusion from all aspects of the countervailing duty order. If one were to carry through plaintiffs' contention that the exclusion application must have been made 30 days after the publication of the notice of the countervailing duty investigation, then any subsequent application would have been automatically deemed untimely and therefore denied. L–N would never have had the opportunity to apply for exclusion from every aspect of the countervailing duty order. If this Court were to sanction such a result, it would seem that litigants and not the agency would have the discretion to dictate agency procedure. Clearly this is not the intent of Congress.

The usual procedure for requesting exclusion is to make such a request within 30 days after the publication of the notice of countervailing duty investigation. In its own analysis, the ITA modified this procedure using the word "ordinarily." 45 Fed. Reg. at 4,936. That analysis describes the procedure for automatic exclusion, if appropriate, for those firms which are investigated.

This Court holds the determination made by the ITA to exclude L–N from the affirmative determination following L–N's application after 30 days of the publication of the notice of initiation of the countervailing duty investigation was reasonable, supported by substantial evidence on the record and otherwise in accordance with law.

## CALCULATION OF THE COUNTERVAILING DUTY CASH DEPOSIT RATE

■ Plaintiffs contend that the ITA erred in calculating an estimated countervailing duty cash deposit rate which greatly exceeded the net benefit by foreign manufacturers subject to the ITA's investigation. Plaintiffs claim that errors were made in calculating the net benefits attributable to FOMEX[4] loans as well as calculating the estimated countervailing duty benefit attributable to CEPROFI tax credits.[5]

## FOMEX

Plaintiffs contend that the ITA miscalculated the subsidy that was received by plaintiffs through participation in the FOMEX loan program. An interest rate was set which was paid by the Mexican manufacturers utilizing the program. The rate of interest paid for FOMEX loans was less than the actual commercial rate payable by manufacturers throughout Mexico. Plaintiffs maintain that the ITA should have compared the difference between the FOMEX loan rate and the commercial rate. Instead, the ITA compared the difference between the FOMEX loan rate and the *Indicadores Economicos* (the effective rate published monthly by the Bank of

4. "FOMEX is a trust established by the Government of Mexico to promote the manufacture and sale of exported products. The fund is administered by the Mexican Treasury Department, with the Bank of Mexico acting as the trustee." 50 Fed.Reg. at 1,907.

5. "CEPROFIs are tax credits used to promote National Development Plan goals, which include increased employment, encouragement of regional decentralization, and industrial development, particularly of small- and medium-sized firms." 50 Fed.Reg. at 1,907.

Mexico; hereinafter IE) which plaintiffs claim was an artificially high rate. Plaintiffs also contend that the IE was not representative of a country-wide loan rate because the rate was based upon samples taken in the greater Mexico City area. As a result of this improper comparison, maintain plaintiffs, the ITA determined a higher rate of subsidy than they would have calculated had they compared the FOMEX rate with the commercial rate.

Plaintiffs also contend that a program-wide change took place when the Government of Mexico increased the interest rate for all FOMEX loans, including pre-export peso loans, beginning on April 1, 1984. Plaintiffs claim that there was verified information in the record regarding the 1984 pre-export FOMEX rates. The ITA's response in the final countervailing duty order stated that there was sufficient verified information to use the 1984 interest rates for FOMEX export loans, but there was not sufficient verified information to use the 1984 interest rates for FOMEX pre-export loans. 50 Fed.Reg. at 1,910.

Plaintiffs' arguments that the ITA's selection of the IE rate was not supported by substantial evidence on the record or was not otherwise in accordance with law because the IE rate was greater than the commercial loan rate and was not representative of a country-wide loan rate are not persuasive. The ITA explained in its response to Comment 5 of the final determination that it is a standard departmental practice to use a country-wide benchmark for short-term loans. 50 Fed.Reg. at 1,910. In an earlier countervailing duty determination, *Unprocessed Float Glass From Mexico,* 49 Fed.Reg. 23,097, 23,098 (1984), the ITA defined the IE rate as "the national average commercial rate for comparable short-term loans...." In the final affirmative countervailing duty determination and investigation of the instant case, the ITA explained that it applied the general principles described in detail in the Subsidies Appendix of *Final Affirmative Countervailing Duty Determination and Countervailing Duty Order: Cold–Rolled Carbon Steel Flat–Rolled Products from Argentina,* 49 Fed.Reg. 18,006 (1984), to the

facts of the instant case. 50 Fed.Reg. at 1,907. In *Cold–Rolled Carbon Steel Flat–Rolled Products,* the ITA used a national average commercial rate as the benchmark for short-term peso denominated borrowing. 49 Fed.Reg. at 18,020. The ITA chose the IE in the instant case because it was "verified that the nominal rates charged on FOMEX pre-export loans granted to the fabricated automotive glass companies are the effective rates. These rates [were] the weighted averages of the rates charged by commercial banks on short-term peso loans." 50 Fed.Reg. at 1,907.

In *Cold–Rolled Carbon Steel Flat–Rolled Products,* the ITA explained the reasoning behind selecting a national average commercial rate.

> For our benchmark, we use the most appropriate national average commercial method of short-term financing, rather than company-specific experience. We believe the distinction between our treatment of short-term and long-term loans is valid. Lending short-term generally is not as risky as long-term, because of the shorter duration of the repayment obligation and the greater frequency of accompanying security (for example, accounts receivable). Because there is little need for the lender to vary its terms to account for varying risk characteristics among companies, we would not expect company-specific short-term loan terms to vary from national average terms. Additionally, because of the enormous number of short-term loans involved in many cases, the use of company-specific benchmarks would significantly impair our ability to administer the countervailing duty law within the short time limits established by the Act.

49 Fed.Reg. at 18,020.

■ This Court declines to undertake a *de novo* review of the ITA's methodology. "As long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or

question the agency's methodology." *Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 404–05, 636 F.Supp. 961, 966 (1986), *aff'd,* 810 F.2d 1137 (Fed. Cir.1987). This Court holds that the ITA's decision to use the IE rate, as well as the methods and procedures employed by the agency using its expertise were reasonable, supported by substantial evidence on the record and otherwise in accordance with law.

The defendant admits that the ITA made a misstatement regarding the 1984 FOMEX data since the 1984 commercial rates paid by the plaintiffs were included in the record. C. 8, 27, 33. Nevertheless, the defendant contends that the ITA cannot use the 1984 rates to calculate the amount of subsidies conferred under FOMEX because the 1984 sales data for Crinamex was not verified by the ITA. Since 19 U.S.C. § 1677e (1982 & Supp. V 1987) mandates that the ITA use only verified information, the defendant has requested a remand for the limited purpose of recalculating all FOMEX benefits based on fully verified 1983 data.

The Court agrees that a remand is appropriate to ensure that properly calculated and verified data are employed by the ITA in reaching its determination. The Court instructs the ITA to look at the FOMEX pre-export and export loan data for 1983 and 1984 to determine whether this information is relevant and applicable. If the ITA determines the data is relevant and applicable and verified or reasonably verifiable, the ITA may use such data in making its determination. If a decision is made that the 1984 data is relevant, as was the case for the export loans, the ITA should decide whether it is able to reasonably verify any relevant, unverified information, including, but not limited to the 1984 sales data for Crinamex. If the information is reasonably verifiable and obtainable, then it may be used by the ITA in making its determination.

## CEPROFI

Plaintiffs object to the ITA's use of 1983 data to establish the bounty or grant provided through the CEPROFI program. They claim that since neither party utilized the tax credits during the first six months of 1984 and since this information was verified by the ITA, the 1984 data represents a more accurate accounting and therefore should have been used. Plaintiffs also note that the ITA in its questionnaire specifically requested 1984 data which was provided by the parties. R. 14; C. 8.

Defendant makes two arguments. First, the period of investigation for which the ITA had the most complete data was calendar year 1983. 50 Fed.Reg. at 1,907. Second, defendant argues that the fact that plaintiffs did not use CEPROFIs during the first six months of 1984 will be reflected in the annual administrative review of the determination.

This Court holds the determination by the ITA concerning the use of 1983 CEPROFI data was reasonable, supported by substantial evidence on the record and otherwise in accordance with law.

## CONCLUSION

A remand is ordered as set forth above regarding the reasonably available 1983 and 1984 FOMEX pre-export and export loan data. In all other respects, the determination of the ITA is affirmed.

## ORDER

Upon plaintiffs' motion for judgment upon the agency record, defendant's and defendant-intervenors' memoranda in opposition thereto, and upon all other papers and proceedings herein regarding the final affirmative injury determination by the United States International Trade Administration (ITA) in *Final Affirmative Countervailing Duty Determination and Countervailing Duty Order: Fabricated Automotive Glass From Mexico,* 50 Fed. Reg. 1,906 (1985), it is hereby

ORDERED that the determination is remanded to the ITA; and the ITA is directed to:

(1) review the data on FOMEX loans for 1983 and 1984;

(2) determine whether this information is relevant to the final determination;

(3) determine whether the 1984 data, if deemed to be relevant, is verifiable;

(4) make a determination based upon verified data as to whether FOMEX loans have conveyed a bounty or subsidy;

(5) take any action as a result thereof as in its discretion it deems necessary and appropriate;

(6) report the results of such remand determination to this Court within 45 days from the date hereof. It is further

ORDERED that the ITA's final determination is sustained in all other respects.