The CANADIAN MEAT COUNCIL And Its Members, Including Canada Packers, Inc., Plaintiffs,

Alberta Pork Producers' Marketing Board, et al., Plaintiffs-Intervenors,

v.

UNITED STATES, Defendant,

National Pork Producers Council, et al., Defendants-Intervenors.

Court No. 85–09–01168.

United States Court of International Trade.

May 15, 1987.

Arnold & Porter, Alan O. Sykes and Lawrence A. Schneider, Washington, D.C., for plaintiffs.

Cameron, Hornbostel & Butterman, William K. Ince and Caren Z. Turner, Washington, D.C., for plaintiffs-intervenors.

Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director, Dept. of Justice, Commercial Litigation Branch, Elizabeth C. Seastrum, Douglas Riggs, Gen. Counsel, U.S. Dept. of Commerce, Washington, D.C., for defendant.

Thompson, Hine & Flory, Mark R. Sandstrom, Washington, D.C., for defendants-intervenors.

## MEMORANDUM OPINION AND ORDER

DiCARLO, Judge:

Plaintiffs bring an action under section 516A of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(3) (Supp. III 1985), contesting the final affirmative subsidy determination of the United States Department of Commerce, International Trade Administration (Commerce) in *Live Swine and Fresh, Chilled and Frozen Pork Products from Canada,* 50 Fed.Reg. 24,-097 (June 17, 1985). The Court has jurisdiction under 28 U.S.C. §§ 1581(c) and 2631(c) (1982). Pursuant to Rule 56.1 of the Rules of this Court, plaintiffs move for judgment upon the agency record. The action is remanded.

### I. Background

In response to a petition by the National Pork Producers Council (defendant-intervenor), Commerce initiated a countervailing duty investigation concerning imports of live swine and fresh, chilled and frozen pork from Canada. 49 Fed.Reg. 47,079 (1984). Virtually all of the programs alleged to confer subsidies were programs which conferred benefits directly upon growers of live swine.

Plaintiffs, Canadian Meat Council and its members, are pork packers that produce and export fresh, chilled and frozen pork from Canada. Plaintiffs filed requests for exclusion from the Commerce investigation on the ground that subsidies to swine growers do not benefit pork packers. They argued 1) that in order to find subsidies received by swine growers pass through to pork packers, Commerce must initiate an investigation under section 613 of the Trade and Tariff Act of 1984, 19 U.S.C. § 1671(g) (Supp. III 1985) (upstream subsidy provisions), and 2) an upstream subsidy investigation would reveal that no competitive benefit passes from swine growers to pork packers since packers buy swine from unrelated farmers in arms-length transactions.

Commerce refused to conduct an upstream subsidy investigation, denied plaintiffs' requests for exclusion, and made affirmative subsidy findings as to both live swine and fresh, chilled and frozen pork in its preliminary and final determinations.

Plaintiffs commenced this action seeking an order from the Court remanding the action to Commerce with directions 1) to grant their requests for exclusion from any countervailing duty determination, or 2) to initiate an investigation under section 1671(g) to determine whether subsidies to swine growers confer an upstream subsidy on fresh, chilled and frozen pork from Canada. A motion by defendant and defendant-intervenors to dismiss the action for lack of jurisdiction was denied by the Court in an earlier opinion. *Canadian Meat Council v. United States,* 10 CIT ——, 644 F.Supp. 1125 (1986).

### II. Discussion

19 U.S.C. § 1671(g) states:

Whenever the administering authority has reasonable grounds to believe or suspect that an upstream subsidy, as defined in section 1677–1(a)(1) of this title, is being paid or bestowed, the administering authority shall investigate whether an upstream subsidy has in fact been paid or bestowed, and if so, shall include the amount of the upstream subsidy as provided in section 1677–1(a)(3) of this title.

Section 1677–1(a) states in part:

The term "upstream subsidy" means any subsidy described in section

1677(5)(B)(i), (ii), or (iii) of this title by the government of a country that—

(1) is paid or bestowed by that government with respect to a product (hereafter referred to as an "input" product") that is used in the manufacture or production in that country of merchandise which is the subject of a countervailing duty proceeding;

(2) in the judgment of the administering authority bestows a competitive benefit on the merchandise; and

(3) has a significant effect on the cost of manufacturing or producing the merchandise.

In its final determination Commerce stated that an investigation under section 1671(g) was not initiated to determine whether pork packers received benefits by reason of subsidies bestowed on swine growers since swine are not an input to fresh, chilled and frozen pork.

Commerce found that the statute "gives little guidance on the meaning of the term 'input'," and that "legislative history also does not provide decisive guidance." 50 Fed.Reg. at 25,098. It scrutinized the meaning of the term "input", stating:

We believe there are two characteristics which evidence that live swine should not be considered an 'input' into fresh, chilled and frozen pork products. These characteristics are level of value added and the role of the producer.

*Id.* Commerce then held the upstream subsidies provisions inapplicable, based on findings that operations by packers have a value added of ten percent, which does "not contribute significantly to the value of the live swine," and that "[s]ubstantially all of the raw agricultural product, live swine, is dedicated to the production of unprocessed pork" in what is "a single, continuous line of production." *Id.* at 25,099. According to Commerce swine are not an input into fresh, chilled and frozen pork, and benefits bestowed on live swine can result in the imposition of duties on pork without the necessity of conducting an investigation under section 1671(g) to determine whether benefits pass from swine growers to pork packers.

As further justification, Commerce discussed what it termed an "additional factor." It reasoned that unless countervailing duties were imposed on swine growers and pork packers alike, "subsidized growers could avoid the imposition of duties on their product by selling through pork packers, who simply slaughter and trim the swine, and then export the product to the U.S. in the form of pork meat." *Id.*

Plaintiffs say that Commerce has determined that subsidies received by swine growers presumptively pass through to pork packers. Plaintiffs argue that the upstream subsidies provisions are applicable to allegations that swine subsidies benefit pork packers, since swine are an input product within the meaning of section 1677–1:

Live swine are obviously an input product—indeed, the primary input product— for pork packing. Pork packers purchase live swine from growers, slaughter, bleed and eviscerate the swine, and transform the carcass into various cuts of fresh, chilled and frozen pork. It is hard to imagine any conceivable interpretation of the statute's straightforward language that would mask this basic economic relationship between growers (the upstream producers of the "input product") and packers (the downstream, arms-length purchasers of this input).

Brief for plaintiffs at 15–16.

The question presented is whether in this investigation Commerce lawfully may determine that the subsidies received by swine growers benefit pork packers without a finding that pork packers received an "upstream subsidy" as defined in section 1677–1(a).

**A. Statutory Interpretation**

 In reviewing Commerce's interpretation of sections 1671(g) and 1677–1(a), the Court first must determine whether the statutory meaning is clear. "If the intent of Congress is clear, that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Young v. Community Nutrition Institute,* —— U.S.

——, 106 S.Ct. 2360, 2364, 90 L.Ed.2d 959 (1986) (quoting *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984)). If the statute is silent or ambiguous with respect to a particular issue, the question is "whether the agency's answer is based on a permissible construction of the statute." *Id.* As stated by our appellate court, "[a] reviewing court must accord substantial weight to an agency's interpretation of a statute it administers." *American Lamb Co. v. United States,* 4 Fed.Cir. ——, 785 F.2d 994, 1001 (1986) (citing *Zenith Radio Corp. v. United States,* 437 U.S. 443, 450–51, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1964)); *see Carlisle Tire & Rubber Co. v. United States,* 9 CIT ——, 622 F.Supp. 1071 (1985). But in determining the meaning of statutes, the Court may not ignore the limitations on the agency's role. "When an agency's decision is premised on its understanding of a specific congressional intent, however, it engages in the quintessential judicial function of deciding what a statute means. In that case, the agency's interpretation, particularly to the extent it rests on factual premises within its expertise, may be influential, but it cannot bind a court." *Bureau of Alcohol, Tobacco and Firearms v. Federal Labor Relations Authority,* 464 U.S. 89, 98 n. 8, 104 S.Ct. 439, 444 n. 8, 78 L.Ed.2d 195 (1983).

■ In determining whether Commerce's interpretation properly implements the countervailing duty laws, the Court looks first to the language of the statute. The relevant provision defines an input product as "a product (hereafter referred to as an 'input product') that is *used in the manufacture or production ... of merchandise that is the subject of a countervailing duty proceeding.*" The term "input product" is referred to subsequently in subsections 1677–1(b)(1) & (2). Subsection 1677–1(b)(1) refers to the term "input product" as "the input product referred to in subsection (a)(1)." In the context of section 1677–1(a), the Court holds as a matter of statutory construction that "input product" is provided only as a term of designation for a product "used in the manufacture or production" of the investigated merchandise, and that Congress did not intend the parenthetical term "input" to have independent significance. 19 U.S.C. § 1677–1(a).

■ In the final determination however, Commerce found section 1671(g) inapplicable by analyzing the term "input product" without considering the statutory context, and as a result, improperly failed to determine whether swine is a product "used in the manufacture or production" of packed pork. For example, Commerce focused on whether "[e]mpirically" one could "consider something an 'input' into something else when there is a low level of value added at a given stage of processing." 50 Fed.Reg. at 25,098. Defendant also states that Commerce considered "whether the input must be consumed; whether the product must be one of a number of other inputs; and whether, if it is the same product, but only slightly modified, it can be an input." Commerce offered no explanation as to how these questions related to whether something is "used in the manufacture or production of" an investigated product.

The Court cannot accept defendant's argument that Commerce "carefully considered the statutory definition." Commerce's final determination never mentions the statutory definition of the term "input product." Commerce states only that the statute provides little guidance and broad discretion.

Consequently, Commerce's statement that "the value added at the packing stage is only 10 percent," and that "packers are merely making the swine ready for the next consumers, consumers of pork meat," 50 Fed.Reg. at 25,099, fails to answer the pertinent inquiry whether swine are used in the manufacture or production of fresh chilled or frozen pork. Defendant concedes that in a general sense the answer to whether swine are used in the manufacture or production of unprocessed pork, "of course, has to be yes," but argues that the statutory language can only be understood in light of Commerce's past practices.

Transcript of Oral Argument at 13. But the Court finds that Commerce's past practices are of little relevance in answering the inquiry whether something is "used in the manufacture or production of" an investigated product, since that inquiry was not required in investigations prior to the enactment of the upstream subsidy provisions. *See* part II, B., *infra.* Commerce must conduct its investigations under the applicable statutory provisions.

Co-counsel, appearing on behalf of Commerce, argues that Commerce could properly find that swine are not "used in the manufacture or production of" fresh, chilled and frozen pork within the meaning of section 1677–1. "The way to understand this is to understand the slaughtering process, as opposed to the manufacturing process. Basically, what you do is you take a hog and you disassemble it, and extract the meat—and you do not perform any operations on that." Transcript of Oral Argument at 26–27.

Such a narrow interpretation of the phrase "used in the manufacture or production of" in section 1677–1(a) ignores the fact that the upstream subsidies provisions were designed as a remedial measure to prevent what Congress believed to be a widespread unfair trade practice. Commerce's interpretation would reduce drastically the applicability of those provisions. By limiting the applicability of the upstream subsidies provision, Commerce apparently would, as in this case, automatically impute early stage subsidies to later stage products on the ground that the products are essentially the same at all stages. But Congress intended that section 1677–1 remedy a law which did not address "subsidies bestowed on products at prior stages of manufacture or production." *See* H.R.Rep. 98–1156, 98th Cong.2d Sess. 170 (1984), U.S.Code Cong. & Admin. News 1984, pp. 4910, 5287. In this case it cannot be disputed that any benefits reaching packed pork products are bestowed at prior stages of production, and are thus the type of subsidies to which the upstream provisions apply. Commerce's argument that products essentially identical, such as wiped and unwiped tomatoes, or boxed and unboxed shirts, should be subject to the same subsidy determination does not provide grounds for holding the upstream subsidies provisions inapplicable to subsidies bestowed at prior stages of production. In Commerce's examples it is questionable whether there are any separate stages of "manufacture or production" at all. But in this case, the transformation of live swine to fresh, chilled and frozen pork indisputably involves a process of manufacture or production, and live swine and packed pork are not in essence identical.

## B. Legislative History

The government contends that Commerce's determination can be sustained on the strength of Congress' approval of prior administrative practices. Commerce stated: "As the legislative history indicates, Congress intended that section 613 generally codify our past practices." 50 Fed.Reg. 25,098. According to defendant, Commerce properly followed its prior practices in two investigations where subsidies were bestowed on agricultural products which were later used in the production of later stage products.

In the final determination Commerce noted that in *Lamb Meat from New Zealand: Preliminary Countervailing Duty Determination,* 46 Fed.Reg. 58,128 (1981), and *Certain Fish from Canada: Final Countervailing Duty Determination,* 43 Fed. Reg. 25,996 (1978), subsidies on lamb and whole fresh fish were found to provide equal benefits on packed lamb meat and filleted fish. Commerce stated: "Because Congress intended that section 613 codify our prior practices, we conclude that Congress did not intend that we alter our practices in situations similar to those arising in *Lamb Meat* and *Certain Fish.*" 50 Fed. Reg. at 25,099.

Defendant supports Commerce's view by citing references to past practices in House Conf.Rep. No. 98–1156, 98th Cong., 2d Sess. 170, *reprinted in* 1984 U.S.Code Cong. & Ad.News 5220, 5287–88 ("Recent decisions by the Department of Commerce have indicated some degree of coverage of subsidies at prior stages of manufacture or

production."), and in Senate floor debate, 130 Cong.Rec. 13970 (Oct. 9, 1984) (remarks of Senator Dole) ("As redrafted, the provision clearly and unambiguously manifests our intent generally to codify current Commerce Department practice in the area.").

Plaintiffs contend that no support for Commerce's determination is provided in legislative history. They assert that the past practices referred to in the legislative sources are not those in the *Lamb Meat* investigation, which never proceeded to a final determination, or those in *Certain Fish*, an investigation initiated by the Treasury Department prior to the Trade Agreements Act of 1979. Plaintiffs argue that the relevant precedents are to be found in a series of 1982 cases involving steel products, including *Certain Steel Products from the Federal Republic of Germany*, 47 Fed.Reg. 39,345, 39,351 (1982), in which Commerce stated:

> [B]enefits bestowed upon the manufacture of an input do not necessarily flow down to the purchaser of that input, if the sale is transacted at arm's length. In an arm's length transaction, the seller generally attempts to maximize its total revenue by charging as high a price and selling as large a volume as the market will bear.

The legislative sources lack specificity in their references to prior administrative practices. But regardless whether the sources refer to all or only some of Commerce's prior investigations, the Court finds that Congress intended to provide a statutory mechanism for dealing with allegations that producers of products subject to investigation were benefiting from subsidy practices taking place at earlier stages of manufacture or production:

> New section 771A(a) establishes clearer limitations on a form of unfair trade practices which currently is subject to insufficient discipline. Although upstream subsidies are supposedly cognizable under present law, *the Committee believes such practices must be dealt with more adequately by the statute.* There are no clear statutory guidelines and the Department of Commerce has refrained from utilizing the law effectively against this increasingly popular form of government assistance. *Including a specific rule for upstream subsidies will provide greater guidance and will also serve to notify foreign producers that they will not be insulated from liability simply because the benefit they receive is on a product at an earlier stage of production.*

H.Rep. No. 725, 98th Cong., 2d Sess. 33 (1984), U.S.Code Cong. & Admin.News 1984, p. 5160 (emphasis added).

Commerce also reasoned that the legislative history recognizes special rules may apply in investigations concerning agricultural products. "In a case concerning an agricultural product such as this, it is particularly inappropriate to term the raw product an 'input' into the next stage or further processed product." 50 Fed.Reg. at 25,099. Cited as support for the "special nature of agriculture," is a portion of the legislative history of the 1979 Trade Agreements Act dealing with special problems involving injury determinations in agricultural cases. *See* S.Rep. No. 249, 96th Cong., 1st Sess. 88 (1979).

In considering the problems faced by the Commission in making injury determinations, Commerce discovered what it deemed to be a relevant practice used by the Commission "for collapsing producers of a raw agricultural product and producers of a more processed product into a single industry." 50 Fed.Reg. at 25,099. It said that the Commission determines first whether a raw agricultural product is one which can only be sold in one market and enters "a single, continuous line of production resulting in one end product." *Id.* (quoting *Frozen Concentrated Orange Juice*, Inv. No. 701–TA–184, USITC Pub. No. 1406 at 19 (July 1983)). Commerce found that swine production came within this aspect of the Commission test. Commerce also said that the Commission looks for "commonality of economic interest," which it found to be satisfied since "pork packers have expressed their commonality of economic interest with hog growers by joining in or supporting the petition." 50 Fed.Reg. at

24,099. According to Commerce, the satisfaction of the same test provides grounds for determining that the subsidies bestowed on a raw agricultural product are bestowed equally on later stage products:

> The primary, if not the sole, purpose of all segments of the industry in this case is to produce a single end product—pork meat. Substantially all of the raw agricultural product, live swine, is dedicated to the production of unprocessed pork. The fact that beyond this stage many separate processed products can be made, *e.g.*, canned ham and sausage, is irrelevant. The key is that there is a single, continuous line of production from live swine to unprocessed pork.

50 Fed.Reg. at 25,099.

This attempt by Commerce to carve out what would be an agricultural exception to the statutory method for determining upstream subsidies, reaches far beyond the context in which Congress recognized the special nature of agriculture. Whatever distinctions may be warranted in determinations by the Commission regarding determining the scope of a domestic agricultural industry in the context of injury determinations, the upstream subsidies provisions and their legislative history make no mention of distinctions to be drawn between products which are agricultural in nature and products which result from a process of manufacture. Absent statutory recognition of special rules applicable to investigations concerning early stage agricultural subsidies, there is no reason why Commerce should depart from the course set by Congress under section 1677–1 for determining whether upstream subsidies pass through to later stage products in agricultural cases.

Furthermore, the Commission's final determination in this case does not support Commerce's reasoning. In *Live Swine and Pork from Canada,* Inv. No. 701–TA–224 (Final), USITC Pub. 1733 (July 1985), the Commission found that live swine and fresh, chilled and frozen pork are distinct products and that producers of those products do not constitute a single industry:

> The imported products in this investigation are live swine and fresh, chilled, or frozen pork. In the preliminary investigation, the Commission arrived at some tentative conclusions regarding the definition of the like product and domestic industry. In this final investigation, we have reexamined these conclusions in light of additional information. We determined that there are two like products: (1) live swine and (2) fresh, chilled, or frozen pork.

> Our determination that live swine and fresh, chilled, or frozen pork are two like products is based upon a number of factors. Obviously, the characteristics of live swine are different than fresh, chilled, or frozen pork. In addition, the products have different uses. Swine are produced by growers for the purpose of being sold to, and slaughtered by, the packers. Unprocessed pork is sold by packers to remanufacturers for further processing into food and various by-products or can be sold directly to end users.

> Further, the two are produced in very different facilities: one involves facilities for raising hogs; the other requires facilities for slaughtering hogs. To be converted into pork, live swine must be subjected to the slaughtering process during which they are stunned, bled, scalded, dehaired, decapitated, and eviscerated. *These packing operations add substantial value by transforming the live animal into pork.* The products also sell to different markets; packers buy swine, while processors or retailers buy pork. [Emphasis added.]

This conflicts with Commerce's finding that pork packers contribute insignificantly to the value of packed pork. While it should be noted that Commerce did not have the benefit of the Commission's final determination at the time the final subsidy determination was issued, the Commission's final determination, if relevant, would contradict rather than support Commerce's final determination.

## C. Additional factors

Commerce's decision that swine subsidies benefit packers of fresh, chilled and frozen

pork and growers of live swine equally was supported in its final determination by an additional consideration—a belief that a countervailing duty order relating only to swine would be circumvented by a shift away from live swine and toward packed pork imports:

> Our conclusion that live swine is not an input into pork products is supported by one additional factor—absent such a finding, growers of live swine would be able to circumvent the imposition of countervailing duties. *If we are to find that benefits to live swine do not benefit pork meat, and were to impose duties only on live swine, subsidized growers could avoid the imposition of duties on their product by selling through pork packers, who simply slaughter and trim the swine, and then export the product to the U.S. in the form of pork meat.*
>
> We recognize that, when we impose countervailing duties on a given product, exporters may be encouraged to shift exports from that product to some form of the same product at a prior or later stage of processing. However, in the case of an agricultural product such as pork, producers can shift very easily to the production of latter-stage products, by making only minor changes to that product. *In this case, it is reasonable to assume that if countervailing duties were imposed only on live swine, exports to the U.S. would shift almost instantaneously to fresh, chilled and frozen pork.*

50 Fed.Reg. at 25,099–100 (emphasis added).

Fear of circumvention is a consideration which is accorded no role under the statute in determining whether the upstream subsidy provisions are applicable to an investigation. No matter how well reasoned the finding by Commerce, a circumvention rationale was not intended by Congress to negate the applicability of provisions which, by their own terms, apply.

If upstream subsidies are bestowed on packers by reason of subsidies to swine growers, countervailing duties will accord-ingly be imposed on packed pork once the investigation and findings are carried out under section 1671(g). On the other hand, if an upstream subsidy investigation reveals that swine subsidies do not benefit packers of pork meat, countervailing duties will not and should not be imposed on unprocessed pork imports. Rather than providing a means of circumvention, section 1671(g) constitutes Congress' attempt to resolve the circumvention problem by including upstream subsidies in a subsidy determination in addition to those subsidies found to have been bestowed directly on the merchandise under investigation. 19 U.S.C. § 1677–1(c). As stated in the House Report, *supra,* Congress intended that these provisions "serve to notify foreign producers that they will not be insulated from liability simply because the benefit they receive is on a product at an earlier stage of production." If the statutory approach to upstream subsidies is inadequate, it is not the role of Commerce or the Court, but of Congress to remedy any deficiency.

### III. Conclusion

Commerce's failure to use the upstream subsidies provisions in its determination that subsidies to swine growers benefit pork packers, is based on an impermissible interpretation of the statute and is not in accordance with law. Allegations that swine subsidies benefit pork packers may result in a finding that packers receive subsidies provided such practices come within the terms of the upstream subsidies provisions, 19 U.S.C. §§ 1671(g); 1677–1(a).

The action is remanded. If Commerce determines that there are reasonable grounds to believe or suspect that Canadian swine subsidies bestow an upstream subsidy on packers of fresh, chilled and frozen pork within the meaning of 19 U.S.C. § 1671(g), Commerce shall investigate whether an upstream subsidy has in fact been bestowed. Should Commerce not find reasonable grounds to believe or suspect that an upstream subsidy is being paid or bestowed, it shall exclude fresh, chilled and frozen pork from the affirmative subsidy determination. The parties shall confer and propose a date for a conference with

**630**

the Court to discuss a remand schedule. So ordered.